**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Margaret Hayek, as trustee for the next of kin of William Charles Hayek, deceased, | Civil No. 05-867 (DWF/AJB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| City of St. Paul, Mark Nelson, Matthew Toronto, Jay Thompson, Peter Crum, and John Linssen, | |
| Defendants. | |

_____

Andrew P. Engebretson, Esq., Engebretson Law Office, counsel for Plaintiff.

Portia M. Hampton-Flowers, Assistant St. Paul City Attorney, St. Paul City Attorney's Office, counsel for Defendants.

_____

**Introduction**

This matter is before the Court pursuant to a Motion for Summary Judgment brought by Defendants City of St. Paul (the "City"); Mark Nelson, Matthew Toronto, Jay Thompson, Peter Crum, and John Linssen, all personally, individually, and in their capacities as St. Paul Police Officers (collectively, the "Officers"). By the Complaint (the "Complaint"), Plaintiff Margaret Hayek ("Plaintiff"), as trustee for the next of kin of decedent William Charles Hayek ("Hayek"), alleges wrongful death, battery, a violation

of the Minnesota Constitution, and a violation of 42 U.S.C. § 1983.  For the reasons set forth below, the Court grants Defendants' motion.[1]

## Background[2]

### I.     Events of September 2, 2002

This case arises from the tragic shooting death of Hayek by St. Paul police officers.  On September 2, 2002, Plaintiff, Hayek's mother, returned to her apartment around 10:00 p.m. where she found Hayek sitting in a chair holding a children's bible while a three-foot long samurai sword lay beside him.  Plaintiff noticed two cardboard boxes by the door that contained video games and toys.  Plaintiff reached down toward the boxes, and Hayek told her "Don't touch them."  (Aff. of Portia Hampton-Flowers in Supp. of Defs.' Mot. for Summ. J. ("Hampton-Flowers Aff."), ¶ 7, Ex. E, Dep. of Margaret Hayek ("Plaintiff Dep.") at 75.)  Hayek then told Plaintiff, "I love you, Mom, but you have the devil in you."  (*Id.* at 76.)  Plaintiff testified that at that moment she realized that something was wrong with Hayek and that she felt scared.

---

[1]     Defendants request that the Affidavit of Andrew Engebretson, dated August 29, 2006, and Hayek's Final Expert Report be excluded as untimely.  Consistent with the Court's remarks off the bench at oral argument, the Court will only consider what has been timely submitted.  Thus, the Court grants Defendant's request to exclude the affidavit and the Final Expert Report.  The Court, however, notes that inclusion of the affidavit and Final Expert Report would not have changed the outcome of this case.

[2]     Most of the facts are undisputed.  Where there are disputes, however, the Court views the facts in the light most favorable to Plaintiff as required by Rule 56 of the Federal Rules of Civil Procedure.

Plaintiff called Crisis Intervention and told them about her son's behavior. The Crisis Intervention operator told Plaintiff to call the police. When Plaintiff hung up the phone, she received a phone call from a friend who had spoken with Hayek earlier that day. Her friend stated that "[t]here's something wrong with [Hayek]." (*Id.* at 76.) Her friend also stated that Hayek told him that the "police were out to get him" and that "the police tapped his phone." (*Id.*) Plaintiff's friend suggested that Plaintiff call her sister, Patricia Motter, who works with mentally ill people. Plaintiff then called Motter and told her about Hayek's behavior. Plaintiff handed the telephone to Hayek so that Motter could talk with him, but Hayek disconnected the call.

Plaintiff then went back into her bedroom and telephoned her cousin, Bud Lee. Lee told Plaintiff that Hayek had been at his house all day and that Hayek was "going in and out of reality and stuff." (*Id.* at 78.) Meanwhile, Motter called 911. Motter told the 911 operator that her nephew, Hayek, was talking irrationally to her sister and that Motter was worried for her sister's safety. Motter also told the operator that Hayek was 19 years old, about 6 foot 8 inches tall, and weighed about 300 pounds. Motter told the operator that Hayek had been diagnosed with an emotional and behavioral disorder. The operator dispatched St. Paul police officers to Plaintiff's apartment to investigate.

The 911 operator then called Plaintiff. Out of Hayek's presence, Plaintiff told the 911 operator that she thought her son was having a nervous breakdown. Plaintiff also told the operator that Hayek had "a great big sword" and was "acting weird."

(Hampton-Flowers Aff., ¶ 12, Ex. J, 911 transcript ("911 transcript") at 4.)  Plaintiff told the operator that Hayek had locked her apartment door and told her that the devil was in her.  Plaintiff then took her apartment keys and walked out of the apartment.  The operator asked Plaintiff for a description of Hayek.  Plaintiff stated that Hayek was 6 feet 8 inches tall and weighed over 200 pounds.  Plaintiff then reported to the operator that police officers had arrived, and she ended the 911 call.

      Plaintiff met Officers Nelson and Toronto outside of her apartment building.  Plaintiff told the officers that Hayek was not on any medication.  Plaintiff noticed that one officer carried a rifle and stated, "That's not necessary."  (Plaintiff Dep. at 79.)  Plaintiff testified that the officer replied, "Oh, yes, it is."  (*Id.* at 80.)  Plaintiff showed the officers where her apartment door was located and gave them the key to unlock it.

      As Nelson and Toronto approached the third floor, they could see through a large window that a second squad had arrived.  Nelson and Toronto decided to wait for the officer in that squad to enter the apartment building before approaching Plaintiff's apartment.  When Nelson and Toronto arrived at Plaintiff's apartment, the door was unlocked.  Toronto opened the door and began speaking with Hayek from the hallway.  The officers saw Hayek seated in a chair holding the samurai sword.  The end of the sword was in his lap and the blade was pointing toward the ceiling.  The officers told Hayek to put the sword down and stated that they were his friends.  Plaintiff testified that Hayek replied, "No, you're not.  You're the devil.  My mom's the devil.  Bud's the devil.

He's trying to poison me." (*Id*. at 124.) Hayek then threw a bottle of prescription vitamins at the door. Toronto determined that Hayek was not going to put down the sword and therefore requested canine assistance.

The officers continued to try to talk with Hayek. Officers Linssen, Crum, and Thompson, along with his canine partner, Harley, arrived at the scene. Toronto again told Hayek that the Officers were there to help and asked Hayek to come out of the apartment. Eventually Hayek shrugged his shoulders, laid down the sword, and walked out of the apartment.

Plaintiff testified that once Hayek entered the hallway, two officers "took him and threw him up against the wall and took his right hand and pulled it behind and put one handcuff on." (*Id*. at 127–28.) Plaintiff testified that once the first handcuff was placed on Hayek, he pushed the two officers, ran back into the apartment, and closed the door. Plaintiff then testified that all of the Officers and the canine entered the apartment and closed the door. Plaintiff could not see what happened inside of the apartment.

Thompson testified that he entered the apartment to stop Hayek from grabbing the sword. Thompson released his police canine, which bit Hayek's leg. Thompson testified that Hayek began dragging the canine behind him. Thompson testified that Hayek began moving toward the sword as soon as he entered the apartment. Thompson tried to tackle Hayek to the floor in order to prevent Hayek from reaching the sword. Instead, Thompson fell to the floor. Hayek picked up the sword and swung it at Thompson.

5

Officer Thompson yelled for help and the other officers commanded Hayek to drop the sword. Hayek, however, continued to attack Thompson with the sword.

Hayek slashed Thompson's arm with the sword. At that point, Officers Crum and Linssen fired their weapons at Thompson. Crum and Linssen testified that they believed Hayek was trying to kill Thompson. Linssen could hear Hayek say, "Ow," as the bullets struck his body. (Linssen Aff. at ¶ 12.) Although Hayek had been shot, he followed Thompson, who had begun crawling toward the apartment door on his hands and knees. Hayek then stabbed Thompson in the right arm.

The sword went through Thompson's arm and into his chest, breaking Thompson's rib and puncturing his lung. The stab wound left a jagged three- to four-inch wound in Thompson's arm. Thompson continued crawling toward the door, and Hayek continued stabbing at Thompson. Hayek then stabbed Thompson's right leg. The sword entered the right side of Thompson's right leg, cutting his femoral artery. After Hayek stabbed Thompson in the leg, Officer Nelson fired two rounds from his shotgun. At that point, Hayek stopped his attack and fell to the floor.

Nelson and Toronto began performing CPR on Hayek. Linssen attempted to render first aid to Thompson. The Officers requested two paramedic units. When the units arrived, one took Thompson to the hospital and the other pronounced Hayek dead at the scene. Thompson was hospitalized for two and a half weeks as a result of the injuries he sustained.

**II.    Procedural Posture**

Plaintiff filed a four-count Complaint in this Court. After discovery, Defendants moved for summary judgment. As part of that motion, Defendants submitted the expert witness report of David Grossi, a law enforcement trainer and consultant. Grossi reviewed written statements, police reports, interview summaries, autopsy reports, and deposition transcripts. Grossi concluded that the Officers' use of force, including the attempt to handcuff Hayek, the use of the police canine, and the use of deadly force, was objectively reasonable. (Hampton-Flowers Aff., ¶ 15, Ex. K at 9–12.) In response, Plaintiff submitted the preliminary expert report of Dr. J.P. Cronin, a licensed psychologist. (Aff. of Andrew Engebretson ("Engebretson Aff."), Ex. B.) In his preliminary expert report, Cronin states that a mental disease or disorder "likely was the reason for [Hayek's] untimely death." (*Id.*)

Defendants assert that they are entitled to summary judgment on all of Plaintiff's claims. First, the Officers contend that they are entitled to qualified immunity on Plaintiff's 42 U.S.C. § 1983 claim. Next, Defendants contend that they are entitled to official immunity and vicarious official immunity on Plaintiff's state law claims. Finally, Defendants contend that Plaintiff's claim for violation of the Minnesota Constitution should be dismissed for failure to state a claim.

**Discussion**

I.   **Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record, which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**II.     Section 1983 Claim**

Plaintiff asserts a violation of 42 U.S.C. § 1983 against the Officers. Section 1983 prohibits a person acting under color of state law from depriving another person of his or her "rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. Plaintiff asserts that the Officers' use of deadly force violated Hayek's constitutional right to be free from excessive and unreasonable force in violation of 42 U.S.C. § 1983. Plaintiff asserts that the Officers' alleged excessive and unreasonable force violated Hayek's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States' Constitution.

The Officers contend that they are entitled to qualified immunity on Plaintiff's § 1983 claim. Qualified immunity shields government officials as well as private individuals from civil liability under 42 U.S.C. § 1983. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). A defendant is shielded from civil liability if it is shown that his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). On a motion for summary judgment, the Court employs a three-part test to determine whether qualified immunity exists. *Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir. 1999) (citing *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)).

First, the plaintiff must assert a violation of a constitutional right. *Id.* Second, the alleged right must be clearly established. *Id.* Third, taking the facts in the light most

favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated the plaintiff's clearly established rights. *Id.* "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'" *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In determining whether Plaintiff has satisfied the first prong, the Court will examine Plaintiff's assertion that the Officers violated Hayek's Fourth-Amendment rights. The Court evaluates excessive force claims, including the use of deadly force, under an objective-reasonableness test.[3] *Graham*, 490 U.S. at 397. In determining whether the use of force is "reasonable" under the Fourth Amendment, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government interests at stake. *Id.* at 396 (citation omitted). The reasonableness of the use of force must be judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

The reasonableness determination also must make allowances for the fact that police officers make split-second judgments in oftentimes-tense situations. *See Graham*, 490 U.S. at 396-97. Therefore, the United States Supreme Court has set out the reasonableness inquiry as one that requires courts to determine "whether the officers'

---

[3] Plaintiff's Fifth and Fourteenth Amendment claims are analyzed under the same analysis. *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978)). It is reasonable for an officer to use deadly force if he or she has probable cause to believe the individual "poses a significant threat of death or serious physical injury to the officer or others." *Hernandez v. Jarman*, 340 F.3d 617, 622 (8th Cir. 2003) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).

Plaintiff maintains that the Officers created the need to use deadly force by failing to appropriately deal with Hayek, who they knew was mentally ill. In particular, Plaintiff contends that the Officers knew or should have known that attempting to handcuff and releasing a police canine would ignite Hayek's paranoia. Further, Plaintiff contends that the Officers' attempt to handcuff Hayek was unjustified and that the Officers' deployment of the police canine without giving a verbal warning was unreasonable. Instead, Plaintiff contends that the Officers should have used more patience and restraint in dealing with Hayek after he exited the apartment. Additionally, Plaintiff contends that one of the Officers should have run into the apartment and grabbed the sword when Hayek walked into the hallway in order to prevent Hayek from retrieving the sword.

The Court finds no merit in Plaintiff's arguments. The Court's Fourth Amendment analysis of a police officer's decision to use deadly force is analyzed at the time the decision to use deadly force was made, regardless of whether the seizure involves a mentally ill person. *See Schneider v. City of Minneapolis*, No. 03-CV-03510, 2006 WL

1851128, *6 (D. Minn. June 30, 2006) (citing *Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995)).  After analyzing the information the Officers possessed when they chose to use deadly force, the Court concludes that the Officers' use of deadly force was reasonable as a matter of law.

Here, it is undisputed that at the time the Officers shot Hayek, he was attacking Officer Thompson with a samurai sword and had ignored the Officers' commands to drop his weapon.  The Officers only used deadly force after Hayek had attacked Thompson and when they feared that Hayek would kill Thompson.  The fact that Hayek actually attacked an officer with a deadly weapon makes this case more egregious than other cases that have considered police officers' use of deadly force against mentally ill persons.  *See, e.g., Thao v. City of St. Paul*, No. 03-5306, 2006 U.S. Dist. LEXIS 19409 (D. Minn. April 13, 2006) (granting summary judgment in favor of defendant police officers on plaintiff's 42 U.S.C. § 1983 claim).

Additionally, the Officers' attempt to handcuff Hayek was not unreasonable.  Here, the Officers responded to Motter's 911 call in which Motter stated that she was worried for her sister's safety because of Hayek's irrational behavior.  The Officers later witnessed Hayek's irrational behavior when they saw Hayek holding the samurai sword and heard him say that the Officers and his mom were the devil.  Thus, the Officers were presented with a potentially unstable individual in possession of a dangerous weapon and were authorized to take Hayek into custody because Hayek was a danger to himself and

others. *See* Minn. Stat. § 253B.05, subd. 2 (authorizing peace or health officers to take a person into custody if the officer has reason to believe the person is mentally ill and in danger of injuring himself or others if not immediately detained). Therefore, the Officers' attempt to handcuff Hayek was not unreasonable.

Further, the Officers' deployment of the police canine without a verbal warning was not unreasonable. At the time this incident occurred, the law did not require officers to provide a verbal warning or announcement before deploying a police canine to apprehend a fleeing suspect. *See Kuha v. City of Minnetonka*, 176 F. Supp. 2d 926, 933 (D. Minn. 2001) ("Kuha I"), *overruled in part by Kuha v. City of Minnetonka,* 365 F.2d 590 (8th Cir. 2003) ("Kuha II"). Thus, even though the law has since changed as discussed in Kuha II, at the time of this incident the Officers had no reason to believe that deploying the canine without giving a verbal warning was impermissible and therefore unreasonable.

Thus, the Officers' use of deadly force was objectively reasonable as a matter of law. Consequently, Plaintiff has not established that the Officers violated Hayek's constitutional rights and therefore failed to establish the first prong of the test. Accordingly, the Officers are entitled to qualified immunity, and summary judgment on Plaintiff's claim that the Officers' use of deadly force was unreasonable.

### III.   State Law Claims

Plaintiff also asserts state law claims of negligence and battery against the Officers. In addition, Plaintiff asserts that the Officers' alleged wrongdoing is imputable to the City.

### A.   Officers Nelson, Toronto, Thompson, Crum, and Linssen

The Officers assert that they are entitled to official immunity on all state law claims. Under Minnesota law, public officials are automatically entitled to official immunity from state law claims when their duties require the exercise of discretion, so long as the officer is not guilty of a willful or malicious wrong. *See Johnson v. Morris*, 453 N.W.2d 31, 41–42 (Minn. 1990); *Elwood v. County of Rice*, 423 N.W.2d 671, 677 (Minn. 1988). Under Minnesota law, the decision to use deadly force is a discretionary function entitling a police officer to official immunity, absent a willful or malicious wrong. *Maras v. City of Brainerd*, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993).

Malice, in the official immunity context, means intentionally committing an act that the official has reason to believe is legally prohibited. *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994). In determining whether the official acted with malice, the Court conducts an objective inquiry that examines the legal reasonableness of an official's actions. *Id.* An officer does not commit a willful and malicious wrong unless the officer relies on information that the officer knows to be false. *Johnson v. County of Dakota*, 510 N.W.2d 237, 240 (Minn. Ct. App. 1994). To overcome

14

a defense based on official immunity, a plaintiff cannot rely on "bare allegations of malice"; rather, a plaintiff must present specific facts evidencing bad faith. *Harlow*, 457 U.S. at 817.

The Officers assert that Plaintiff has set forth no evidence that they acted with malice, ill will, or with the intent to act unlawfully. Plaintiff contends that the Officers precipitated the confrontation with the decedent. In particular, Plaintiff contends that the officers inflamed Hayek by trying to handcuff him and by deploying a police dog against him. Plaintiff contends that the Officers should be denied official immunity under *Mumm v. Mornson*, 708 N.W.2d 475 (Minn. 2006), because the Officers allegedly failed to follow the St. Paul Police Department's Policy on Emotionally Disabled Persons.

Additionally, Plaintiff contends that Minn. Stat. § 609.066, subd. 3, applies to the claims of those "who have been driven by mental illness and [as] a result have been done to death by police gunfire." (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 14.) That statute provides that Minnesota statutes authorizing the use of deadly force "may not be used as a defense in a civil action brought by an innocent third party." Minn. Stat. § 609.066, subd. 3. Plaintiff contends that Hayek, as a result of his mental disease or disorder, stands as an innocent third party within the statute and cannot be held responsible for "having [acted] in accordance with the dictates of a troubled mind." (*Id.* at 13.) Because of Hayek's alleged status as an innocent third party, Plaintiff contends that the Officers are barred from claiming official immunity.

15

In light of the information that the Officers had at the time they decided to use deadly force, the Court finds that the Officers' actions were not malicious, willful, or unreasonable under the circumstances. Nor did the Officers rely on information that they knew to be false. Plaintiff's reliance on *Mumm*, 708 N.W.2d 475, is misplaced. In *Mumm*, the Minnesota Supreme Court held that officers in that case were not entitled to official immunity for their decision to initiate and pursue the defendant, a fleeing motorist. *Id.* at 492. The court in that case held that the officers failed to perform a ministerial duty, imposed by the Pursuit Policy, to discontinue their pursuit of the defendant because they knew the defendant's identity. *Id.* But here, Plaintiff has not contested that the officers' conduct was discretionary, rather than ministerial, and therefore entitled to official immunity absent willful or malicious conduct.

Furthermore, Plaintiff cannot establish that the Officers did not follow the St. Paul Police Department's Policy on Emotionally Disabled Persons (the "Policy"). Plaintiff claims that the Officers violated the Policy because they did not: (1) avoid any show of force; (2) try to establish a friendly or understanding relationship with patient; and (3) practice restraint and patience. The record, however, does not support Plaintiff's contentions. Here, the Officers tried to avoid any show of force by standing outside of the apartment and coaxing Hayek out of the apartment on his own volition. The Officers also tried to establish a friendly relationship with Hayek by talking to him and stating that

they were his friends. Although the Officers ultimately resorted to the use of deadly force, the facts support the conclusion that the Officers tried to first follow the Policy.

Further, Plaintiff's reliance on Minn. Stat. § 609.066, subd. 3 is misplaced. Plaintiff has no authority to support her position that Hayek was an "innocent third party" because he was mentally ill. Thus, because the Officers' actions were not malicious, willful, or unreasonable under the circumstances, the Officers are entitled to official immunity from Plaintiff's negligence and battery claims. Alternatively, the Officers assert that Plaintiff's negligence and battery claims fail as a matter of law on this record. The Court need not reach these arguments. Even if Plaintiff has stated claims of negligence and battery, the Court finds that the Officers are entitled to official immunity. Accordingly, the Officers are entitled to summary judgment on Plaintiff's negligence and battery claims.

### B. City of Minneapolis

The City asserts that it is entitled to vicarious official immunity on Plaintiff's negligence and battery claims. An employer may be vicariously immune from liability if the conduct of a government employee is protected by official immunity. *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316–17 (Minn. 1998). Whether vicarious official immunity is available is a policy question for the court. *Pletan v. Gaines*, 494 N.W.2d 38, 42 (Minn. 1992). Here, the Officers exercised discretion in deciding to use deadly force. Because the Court finds that there is no basis for imposing liability on the Officers,

the Court finds that there is no basis for imposing vicarious liability on the City. *See Dokman v. County of Hennepin*, 637 N.W.2d 286, 297 (Minn. Ct. App. 2001) ("Vicarious official immunity protects a governmental entity from liability based on the acts of an employee who is entitled to official immunity."). Accordingly, the Court finds that the City is entitled to summary judgment on Plaintiff's negligence and battery claims.

## IV. Minnesota Constitution

Finally, Plaintiff alleges that the Defendants violated his constitutional rights under the Minnesota Constitution and seeks damages for such violations under Article I, Section 8 of the Minnesota Constitution. Plaintiff suggests that when the government takes the life of a mentally-ill person, the responsible governmental body—here, the City—should pay the next of kin damages. Plaintiff proposes that the Court apply the concept of the doctrine of inverse condemnation to effectuate such a claim. In response, Defendants contend that Plaintiff's claim under the Minnesota Constitution must be dismissed because Plaintiff has failed to state a claim upon which relief can be granted. In particular, Defendants assert that although 42 U.S.C. § 1983 provides a plaintiff with a civil cause of action for alleged violations of the U.S. Constitution, Minnesota does not have a comparable remedial statute that provides a civil cause of action for alleged violations of the Minnesota Constitution.

The Court finds that Plaintiff's claim must be dismissed for failure to state a claim upon which relief can be granted. Minnesota courts have not recognized a damage

remedy for alleged violations of the Minnesota Constitution. *See, e.g., Oehrleins and Sons & Daughters, Inc. v. Hennepin County*, 922 F. Supp. 1396, 1400 (D. Minn. 1996) (holding that Minnesota does not recognize a damage remedy for violations of Art. I, § 7 of the Minnesota Constitution), *reversed on other grounds* 115 F.3d 1372 (8th Cir. 1997). Plaintiff fails to cite any authority to support her suggestion that the Court should apply the concept of the doctrine of inverse condemnation to effectuate her claim that the City should pay her for killing Hayek. Therefore, the Court dismisses Plaintiff's claim for damages under the Minnesota Constitution for failure to state a claim.

## Conclusion

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc. No. 9) is **GRANTED**.

2. Defendants' Request to Exclude the Affidavit of Andrew Engebretson, dated August 29, 2006, and the Final Expert Report of J.P. Cronin is **GRANTED**.

3. Plaintiff's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated:  October 6, 2006         s/Donovan W. Frank
                                DONOVAN W. FRANK
                                Judge of United States District Court